IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 4, 2018

# IN RE VIRGIL W., ET AL.[1]

**Appeal from the Juvenile Court for Anderson County**
**No. J32648, J32649          Darryl Edmondson, Judge**

_____

## No. E2018-00091-COA-R3-PT

_____

A father's parental rights to two children were terminated on the grounds of abandonment by incarceration, substantial noncompliance with the permanency plan, failure to manifest an ability and willingness to assume custody, and upon a determination that terminating the father's parental rights would be in the best interest of the children. Father appeals; finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

David R. Dunkirk, Oak Ridge, Tennessee, for the appellant, Arthur A.

Herbert H. Slatery, III, Attorney General and Reporter; Alexander S. Rieger, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

Brittany W. ("Mother") and Arthur A. ("Father") are the parents of Virgil W., born in June 2011, and Victoria W., born in May 2013. The Department of Children's Services ("DCS") received a referral in March 2015 that the children were being exposed to drugs in their home. An investigation ensued and a dependent and neglect proceeding initiated; by order entered March 18, 2015, the children were removed from the home and

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

placed in the custody of their paternal grandmother, Marquetta B., due to "the parent's substance abuse and mother's ongoing investigation as a perpetrator of sexual abuse." The children were adjudicated dependent and neglected as to the Father on May 13, 2015 due to his substance abuse. As a result of reports that Marquetta B. was not properly supervising the children and had violated the court order by allowing Mother and Father to have unsupervised visitation, the children were ordered into the custody of DCS on August 27; they were placed in a foster home, where they have remained. The children were subsequently adjudicated dependent and neglected due to Marquetta B.'s improper supervision. In a preliminary hearing order entered September 16, 2015, Father was ordered to pay $50 per month per child in child support.

During DCS's involvement with the family, three permanency plans were created.[2] These plans required Father to submit to a mental health evaluation and comply with all recommendations; submit to an alcohol and drug assessment and comply with all recommendations; complete parenting classes and utilize skills learned during visits with the children; comply with all Court orders; resolve outstanding legal issues and not incur any new criminal charges; submit to random pill counts and random drug screening; obtain and maintain a safe and stable residence, income, and transportation; maintain contact with DCS and provide current contact information to the DCS case manager; and pay child support in the amount of $50.00 per child per month; and complete domestic violence and anger management classes.

On August 16, 2017, DCS filed a petition to terminate the parental rights of father alleging abandonment by engaging in conduct prior to his incarceration that exhibited a wanton disregard for the welfare of the children, substantial noncompliance with the permanency plan, failure to manifest an ability and willingness to assume custody, and that termination of Father's parental rights would be in the best interest of the children.[3]

A hearing was held on November 17, at which DCS case manager Christy Lester, foster mother Tabetha H., and Father testified. In an order entered December 15, 2017, the court found that the evidence was clear and convincing that the parental rights of Father should be terminated on the grounds of abandonment by incarcerated parent,

---

[2] The first permanency plan was developed on September 25, 2015, with a goal of return to parent, giving Father until March 25, 2016, to comply with the requirements of the permanency plan; the requirements were explained to Father and the plan was ratified on October 13, 2015. The plan was revised on April 4, 2016, with a goal of return to parent giving Father until October 4, 2016, to comply with the requirements of the plan with an additional requirement that Father will complete domestic violence classes and anger management; the requirements were explained to Father and the plan was ratified on May 27, 2016. The permanency plan was revised again on February 9, 2017, with the goal of return to parent giving Father until August 9, 2017, to comply with the requirements of the plan; the requirements were explained to Father and the plan was ratified on May 26, 2017.

[3] In June 2017, the mother surrendered her parental rights to both children and is not a party in this proceeding.

substantial noncompliance with permanency plans, and failure to manifest an ability and willingness to assume custody. The court also determined that termination of Father's parental rights would be in the best interest of the children.

Father appeals, challenging only the holding that termination of his rights was in the children's best interest. Nevertheless, we review all of the trial court's findings with respect to the grounds for termination as well as the best interest determination. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about

the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. ANALYSIS

### A. ABANDONMENT BY ENGAGING IN WANTON CONDUCT

A parent's rights may be terminated on the ground of abandonment. Tenn. Code Ann. § 36-1-113(g)(1). The statute defines abandonment, in relevant part, as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or *the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .*

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2016) (emphasis added).

This court has stated that section 36-1-102(1)(A)(iv) "reflects the commonsense notion that parental incarceration is a strong indicator that there may be other problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Under the statute, incarceration alone is not a ground for termination; an incarcerated or recently incarcerated parent can be found to have abandoned his or her child "only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Accordingly, a parent's incarceration serves "as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

The pre-incarceration conduct referred to in Tennessee Code Annotated section 36-1-102(1)(A)(iv) is *not* limited to acts during the four-month period immediately preceding the incarceration. *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *8 (Tenn. Ct. App. Apr. 30, 2009) (no perm. app. filed) (citing *In re Audrey S.*, 182 S.W.3d at 871). It is well established that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate

support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the child's welfare." *In re Audrey S*. 182 S.W.3d at 867-68 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App. Jan. 11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005); *In re C. LaC.,* No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar.17, 2004), *no perm. app filed*; *In re C.T.S.,* 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.,* 37 S.W.3d 467, 474–75 (Tenn. Ct. App. 2000).

Pertinent to this ground, the order terminating Father's rights states:

. . . [T]he Court finds that there is clear and convincing evidence that Arthur A[.] was incarcerated from June 6, 2017 until June 23, 2017. . . . Mr. A[.] engaged in conduct prior to his incarceration that exhibits a wanton disregard for the children's welfare by violating his probation and using illegal drugs. Mr. A[.] submitted to a hair follicle drug screen on March 31, 2017 and was positive for amphetamines, methamphetamines and extended opiates. Mr. A[.] was arrested on September 11, 2016 and charged with Aggravated Burglary and Burglary. Mr. A[.] subsequently pleaded guilty to the lesser charges of Joyriding and Theft and placed on supervised probation. In March 2017, Mr. A[.'s] probation officer filed a Violation of Probation warrant against him, alleging that he failed to report to probation and complete an alcohol and drug assessment as ordered. Mr. A[.] pleaded guilty to the Violation of Probation on June 20, 2017. The Court finds that this violation of probation and continued drug use constitutes a wanton disregard on Mr. A[.'s] part for the welfare of the children.

Father does not dispute these findings, and upon our review of the record we conclude that they are supported by clear and convincing evidence. The testimony of Ms. Lester and Father, as well as the criminal record of Father all show that Father pled guilty to criminal behavior, specifically, theft and joyriding, in September 2016 and failed to report to the probation office or complete an alcohol and drug evaluation, as required by the terms of his probation. The evidence is also clear that Father has abused prescription and illegal drugs for years.

Ms. Lester testified that the petition was filed because of Father's incarceration for violation of probation and five counts of contempt of court for failure to pay child support. She also testified that "[b]y violating his probation, [Father] knew he would and could be incarcerated, which would prevent parenting the children" and that he had tested positive for amphetamines, methamphetamines, oxycodone and hydrocodone on a hair follicle drug screen in March 2017.

An intake report made at Ridgeview Behavioral Health Services in August 2016 states that Father acknowledged that he used "a joint or two daily" of marijuana. Father's

5

drug and alcohol assessment states that he "reported that he developed an opiate dependency after being prescribed various opioid medi[c]ation after sustaining a back injury." The assessment's "diagnostic impression" states that father has "[o]pioid use disorder, moderate" and recommended that Father participate in an outpatient substance abuse treatment program.

Father testified that he was "probably" using pain pills when the children were first removed from his home; that he tested positive for methamphetamine, amphetamine, hydrocodone, and opiates during a drug screen in March 2017; and that, prior to going to jail in June 2017 for violating his probation, he was working with the "STOP program" by seeing his psychologist and going to classes to address his alcohol and drug treatment needs but was "probably" still using drugs during that time period.

The results of the drug screens likewise are clear and convincing evidence that Father continued to use drugs throughout DCS's involvement with his family. The hair follicle drug screen he took nine days prior to trial showed that he was still using illegal substances, namely marijuana.

The record contains clear and convincing evidence Father violated the terms of his probation and was incarcerated for a portion of the relevant period. He has not addressed his addiction to drugs, and his continued use of illegal substances is evidence that he has abandoned his children by engaging in conduct that exhibits a wanton disregard for their welfare within the meaning of section 36-1-102(1)(A)(iv). We affirm the trial court's holding in this regard.

### B. SUBSTANTIAL NONCOMPLIANCE WITH THE PERMANENCY PLANS

Tennessee Code Annotated section 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan where:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4[.]

In order for noncompliance to justify the termination of parental rights, it must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008) (no Tenn. R. App. P.11 application filed). Mere technical noncompliance by itself is not sufficient to justify the termination of parental rights. *Id*. Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tennessee Code Annotated section 36-1-113(g)(2). *Id*. (citing *In re Valentine*, 79 S.W.3d at 548-49). In addition, the parent's degree of noncompliance with a reasonable and related requirement must be assessed. *Id*.

6

The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed *de novo* with no presumption of correctness. *Id.* at 546.

With respect to this ground, the trial court found:

The Department has provided more than reasonable efforts in this case to assist the father. The Department properly admitted into evidence documents detailing thirty-eight times that the Department paid for services to directly benefit the father and assist him in completing his tasks on the plans. These services included therapeutic visitation, drug screening, parenting classes, an alcohol and drug assessment, and a mental health assessment. In addition to these services, the Department also attempted to provide random drug screens, housing and employment assistance, and transportation assistance, as well as diligent efforts to maintain contact with the father. The father did not avail himself of the services provided by the Department.

Mr. A[.] failed to maintain regular contact with the children. His last visit was March 31, 2017. Mr. A[.] submitted to a hair follicle drug screen on that same date, March 31, 2017 at the request of the Department. These results were properly admitted into evidence as Exhibit 6 and show that the father was positive for methamphetamine, amphetamines, oxycodone and hydrocodone. Also admitted into evidence was documentation of the child support that Mr. A[.] has paid over the course of the time the children have been in custody. This reflects that Mr. A[.] has paid $10.00 per child in support since the children have been in DCS custody. Mr. A[.] disputed this during his testimony and reported that he believed he has paid approximately $600.00 in child support during this custodial episode. Even if that were to be the case, the Court finds this amount to be token considering the circumstances. Mr. A[.] has not maintained contact with the Department. He has not maintained any form of consistent housing, transportation or income. Mr. A[.] did complete his alcohol and drug and mental health assessments but failed to complete the recommendations of those assessments. He did complete parenting classes. Mr. A[.] has continued to use illegal drugs and has provided no proof of stability. He has lived a transient lifestyle. All of the testimony and evidence heard by the Court point to the father's situation being a result of intentional acts by the father. Based on the foregoing, the Court finds that Arthur A[.] did fail to substantially comply with the permanency plans in this case.

Father does not dispute these findings and concedes in his brief that "in terms of the Permanency Plan, the Appellant did not fully comply with the trial court's orders."

From our review of the record, we conclude that the following evidence supports the findings of the court.

As to Father's compliance with the plans, Ms. Lester testified that Father completed the parenting classes, the alcohol and drug assessment, and the mental health assessment, but that he did not follow the recommendations of each; that he had not submitted to random drug screens or pill counts; that she requested that he "complete a hair follicle drug screen, which tested positive for "methamphetamines, amphetamines, hydrocodone and other extended opiates," after which she requested that he complete a new drug and alcohol assessment. She did not know if he completed a new assessment. She further testified that Father had not provided proof of a stable income or housing; and that Father "had paid $10 per child in the past two years."

With respect to assistance Father received DCS, she testified that DCS "made a total of 38 requests for funding by the Department to pay for case services to include an A[lcohol] & D[rug] assessment, mental health assessment, hair follicle testifying, parenting classes, therapeutic visitation, . . . random drug screens, . . . housing and employment assistance[,] transportation assistance. She also testified that DCS engaged in "ongoing diligent efforts to maintain contact with the Father and provided daily care for the children." Ms. Lester also testified:

> I worked very hard to establish a good relationship with him and to provide him with some encouragement. I've gone myself and located employment for him, which was not utilized. I have continued efforts to work with him, trying to engage him to be a father and parent his children with the services that I provided him. I've worked diligently with his own attorney in attempts to locate him and to work with him and to have his attorney attempt to mediate any animosity that Mr. A[.] had towards me so I could still work with him in that manner.

With respect to visitation, Ms. Lester testified that Father had not visited the children regularly, and that his last visit had been on March 31, 2017. She also testified that:

> [The children] have gone so long without seeing him, that the team feels like even a phone call could upset the children at this point, because he will come into their life for a few months and start to work on his plan and then he is gone again and then he comes back for a few more months and works a little bit and gone again, and that really upsets the children. That instability with that relationship is very upsetting to the children, to the point that I have referred them to a therapist to be evaluated due to my concerns for their well-being.

She testified that Father's behavior toward the children was appropriate, but when asked about her concerns about Father's visitation with the children, Ms. Lester testified:

> The visits between the father and the children were never really good visits. There were always some concerns during the visit, whether it be the lack of interaction between the father and the children or the children's response to seeing the father and acting out behaviorally or verbally, making verbal statements about their parents. There was never a visit that was just a good visit where there was bonding and parenting and a loving relationship.

Father testified that, when the children were removed from Marquetta B.'s home in August 2016, he was living in the "[b]ack of my truck, abandoned house" and that in March of 2017, he did not know exactly where he was living but "was either staying in an old house or with a friend or somewhere." When asked if he had ever sought treatment for his opiate addiction or been to a detoxification facility to get clean, Father testified that he was "basically doing that myself" and that "[r]ight now[,] I'm just dealing with it." As noted earlier in this opinion, the hair follicle drug screen he took nine days prior to the trial showed that he was still using marijuana.

Father testified that he began work at the end of July or early August of 2017 with a traveling amusement company making $280 per week, of which $169 was withheld to pay for his room and board and that shortly after DCS became involved with his family, he moved to West Virginia and worked in the home construction industry making $15 per hour. An exhibit admitted at trial showed that Father made a one-time payment of $10 per child in child support in November 2016. Father contested that amount, testifying as follows:

> Q. When Ms. Lester was testifying earlier, she said you had only paid $10 per child over the last couple years. Is that consistent with your recollection?
> A. No.
> Q. What would you say you have paid over the last couple years?
> A. Over the last two years, I know six, $700 altogether. I mean, it's --
> Q. I'm just talking about Eugene and Victoria. Is that what you're talking about?
> A. No, I'm talking child support. I take it in to child support, give them the money and they split it out between the five.
> Q. So there are three other kids you are paying child support for?
> A. Yes.

The court resolved this conflict in favor of DCS and held that, in any event, the amount that Father testified he paid was, under the circumstances, token support. We agree with the trial court on both holdings. Father's testimony does not preponderate

9

against the DCS record of the support he paid which was introduced into evidence. Even if Father had paid $600 or $700 in the nearly two years since the court ordered him to pay child support, he would still be deficient in his responsibility, as he had been ordered to pay $50 per month per child. In light of his testimony as to his income and expenses during the time children had been in DCS custody, the amount Father testified he paid would constitute token support.

Based upon the evidence in the record, the requirements of the permanency plan were reasonable and related to remedying the conditions which necessitated the children's placement in foster care. DCS provided exceptional efforts to assist Father in meeting the requirements of the plans. Despite these efforts, Father failed to comply with all recommendations from his mental health evaluation and alcohol and drug assessment, incurred new criminal charges; failed to obtain and maintain safe and stable housing, income, and transportation; and failed to pay child support as required or visit the children. The evidence is clear and convincing that Father was not in substantial compliance with the requirements of the permanency plans, and we therefore affirm the trial court's holding in that regard.

C. FAILURE TO MANIFEST AN ABILITY AND WILLINGNESS PERSONALLY TO ASSUME LEGAL AND PHYSICAL CUSTODY OF OR FINANCIAL RESPONSIBILITY FOR THE CHILDREN

Tennessee Code Annotated section 36-1-113(g)(14) provides:

A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, DCS must prove that Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children. Tenn. Code Ann. § 36-1-113(g)(14). Then, DCS must prove that placing the children in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children. *Id.* This Court has observed the following regarding the requirement of "substantial harm":

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes

a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

With respect to this ground, the court found that:

. . . [T]he Court finds that there is clear and convincing evidence that Arthur A[.] has failed to manifest, by acts and omissions, an ability and willingness to personally assume legal and physical custody or financial responsibility for the children, and placing the children in Mr. A[.'s] legal and physical custody would pose a risk of substantial harm to the physical and psychological welfare of the children.

Mr. A[.] has not complied with the requirements set forth for him in permanency plans and made orders of this Court as requirements to regain custody of his children. Mr. A[.] admitted that he had considered himself to have an opiate addiction at one point but reported that he was sober during his testimony. He further reported that his sobriety was maintained by leaving the area and traveling with a carnival for employment. Mr. A[.] also testified that he is paid $280.00 per week and of that amount, $169.00 is taken out for room and board by his employer. However, father testified that his employment with the carnival had ended for the season but he could "go back whenever he wanted." Mr. A[.] has provided no proof of stability, stable housing, or consistent employment. He has continued to use illegal drugs. He has not completed drug treatment and he has lived a transient lifestyle not conducive to stability that the children require. All of the testimony and evidence heard by the point to the father's situation being a result of intentional acts by the father.

Further, when the children came into state custody, they were neglected in the father's care. The foster mother testified that that the children's teeth were in terrible shape and Virgil had to have twenty-two oral procedures on the eighteen teeth he had at that time. She testified that Victoria has a severe lice infestation which took her two weeks to eliminate.

. . . The Court finds that placing the children back into Mr. A[.] care would pose a risk of substantial harm to their physical and psychological welfare.

Father does not challenge any of these findings, and upon our review of the record, we conclude that they are supported by the evidence.

Father's drug screen in March 2017 was positive for hydrocodone, amphetamine, and methamphetamine; a drug screen eight months later was positive for marijuana.[4] Though he testified that he was clean at trial, we have no proof to corroborate his testimony. Further, when he was asked whether life with the traveling amusement company was stable, he responded:

Q. Do you consider that a stable life for children, Mr. A[.]?
A. Do I? The life --
Q. Is that what you want to see for your children?
A. Out there, it's -- I don't want to bring my children up in that. That's what I'm trying to do, is get myself right. I didn't -- I mean, if it has to be, they're right there, they're all family. I mean, we're all together and we all stick as one. So I don't see nothing would be real bad about it.

Father testified that he did not want to raise the children in such an environment, but that if he had to, he did not think it would be "real bad." While Father testified that he was willing to assume custody of the children, he has not addressed the problems inherent in his addiction to drugs, nor has he resolved his need for stable housing or transportation; these failures are clear and convincing evidence that he is unable to assume custody of the children as contemplated by section 36-1-113(g)(14).

As to the second prong, whether placing the children in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children, Ms. Lester testified about Father's failure to visit the children since March 2017 and the fact that "there was never a visit that was just a good visit where there was bonding and parenting and a loving relationship" between Father and the children. Tabetha H. testified about the children's poor state of dental and physical health when they came into her custody, and how Virgil told her how, in Mother's and Father's home, he would "hide from the police when they come to my house" because of "scary things" like fighting. This testimony, as well as the evidence of Father's persistent drug usage, is clear and convincing evidence that returning the children to Father's custody would pose a risk of substantial harm to their physical and psychological welfare. We therefore affirm the court's holding in this regard.

### D. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard.

---

[4] While Father argues that the fact that the latter drug screen was positive for only one illegal substance is "no small accomplishment," we note that it indicates that Father continued to use drugs up to the eve of trial.

*In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[5] The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

---

[5] The factors at Tennessee Code Annotated section 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

The court made the following findings with respect to the children's best interest:

1. Mr. A[.] has not made changes in his conduct or circumstances that would make it safe for the children to go home, as set forth above.
2. Mr. A[.] has not made lasting changes in his lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. The Department has bent over backwards to assist Mr. A[.], but he has not availed himself of the assistance and services offered to him
3. Mr. A[.] has not maintained regular visitation with the children. His last visit was on March 31, 2017. The one time he has been in the area since that date, he did not make arrangements or request to visit with the children.
4. Changing caregivers at this stage of the children's lives will have a detrimental effect on them. They have been in the same foster home for twenty-seven months. They have found safety and stability and are extremely bonded to the foster parents.
5. Mr. A[.] has neglected the children.
6. Mr. A[.] abuses drugs, rendering him consistently unable to care for the children in a safe and stable manner. By his own admission, he had a substance abuse problem and has provided no evidence that he can maintain long-term sobriety.
7. Mr. A[.] has not paid child support consistently. Documentation of the child support that Mr. A[.] has paid over the course of the time the children have been in custody was admitted into evidence and reflects that Mr. A[.] has $10.00 per child in support since the children have been in DCS custody. Mr. A[.] disputed this during his testimony and reported that he believed he has paid approximately $600.00 in child support during this custodial episode. Even if that were to be the case, the Court finds this amount to be token considering the circumstances.
8. The children have established a strong bond with their foster parents, who wish to adopt them.

These findings relate to statutory factors (1), (2), (3), (5), (6), (7), and (9). Father does not dispute any of the above findings, and we find that they are supported by the evidence in the record.

As best we can garner from his brief, Father's contention relative to this determination, quoted here, focuses on factor (1):

But at the hearing, the Appellant produced a subsequent drug screen dated November 8, 2017 which showed a very different profile. While it was positive for marijuana, it was negative for amphetamines and opioids. In terms of the dangers of addiction, the Appellant appears to have overcome the most difficult substances, thanks to getting away from bad influences at home, and giving himself a real chance to get clean.

Appellant would submit that this was no small accomplishment. And as the grounds for the D&N finding, drug dependency was a high priority under the Permanency Plan.

Appellant contends that, once clean from addictive drugs, he would be able to accomplish the remaining steps on his perm[anency] plan. He just needed more time to do so.

This argument, however, asks us to consider the issue from Father's perspective; the best interest determination, however, focuses on what is in the children's best interest. In this case, Father himself testified that his children are in "good hands." The testimony of Tabetha H. and Ms. Lester underscores his testimony. The children are being very well cared for in a loving home where the foster parents are ensuring that their physical, mental, and emotional needs, which had been neglected in Father's care, are now being met. Father's substantial challenges have been set forth earlier in this opinion and our discussion of those challenges bears on the children's best interest as well. On the record before us, we conclude that there is clear and convincing evidence that termination of Father's rights is in both children's best interest.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the trial court terminating Father's parental rights is affirmed.

_____
RICHARD H. DINKINS, JUDGE

15